Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Athanasios E. Agelakopoulos, Esq.
Nevada Bar No. 14339
aagelakopoulos@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887
*Attorneys for the Plaintiff*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>Timothy L. Blixseth,<br><br>               Alleged Debtor. | Case No.: 11-15010-MKN<br><br>Chapter 7<br><br>Jury Trial Demanded |
| Timothy L. Blixseth,<br><br>               Plaintiff,<br><br>v.<br><br>Montana Department of Revenue,<br><br>               Defendant(s). | Adversary Proceeding No.: |

## COMPLAINT

Plaintiff, Timothy L. Blixseth (the "**Plaintiff**" or "**Mr. Blixseth**"), by and through his counsel of record, Schwartz Law, PLLC ("**SL**"), hereby submits his complaint (the "**Complaint**"), against the Montana Department of Revenue ("**MDOR**" or "**Defendant**") (collectively, with Mr. Blixseth, the "**Parties**") as follows:

1

I.      **JURISDICTION AND VENUE.**

1.      This Court has jurisdiction over this action and the Parties pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 105, 303.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(1).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This adversary proceeding relates to the captioned involuntary bankruptcy case styled *In re Timothy L. Blixseth*, Case No. 11-15010-MKN (Bankr. D. Nev. April 5, 2011) (the "**Involuntary Proceeding**"), filed by, among others, Defendant MDOR under section 303 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"). ECF No. 1.

3.      The Bankruptcy Court dismissed the Involuntary Proceeding on June 21, 2021. The Bankruptcy Court's dismissal order has long since become a final order on direct review and is no longer appealable by MDOR or any other persons or entities against which Plaintiff may also seek relief in these proceedings.

4.      In accordance with L.R. 7008, Plaintiff consents to entry of final orders and judgment by the Bankruptcy Court if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution; provided, however, consent under L.R. 7008 is not a waiver of the Plaintiff's rights under Fed. R. Bankr. P. 9015 and Fed. R. Civ. P. 38.

5.      Pursuant to Fed. R. Bankr. P. 9015 and Fed. R. Civ. P. 38, Plaintiff asserts his right to jury trial on all triable issues presented herein.

II.     **PARTIES.**

6.      The Plaintiff, an individual and the alleged debtor in the Bankruptcy Case, is a resident of Nevada.

7.      Defendant MDOR is the governmental taxing authority for the State of Montana.

/ / /

### III.    GENERAL ALLEGATIONS COMMON TO ALL COUNTS/CLAIMS.

### A.    THE PREPETITION MONTANA STATE TAX APPEAL BOARD CASE.

8.    On July 27, 2009, Defendant MDOR notified Plaintiff of certain proposed adjustments of additional tax, penalties, and interest with respect to Plaintiff's Montana state income tax returns for tax-filing years 2002 through 2006 (the "**Audit Period**"), inclusive, totaling over $55,000,000, including approximately $20,000,000 in interest and penalties. Plaintiff immediately notified Defendant MDOR that its assessment and Purported Deficiency was incorrect and promptly disputed in accordance with Montana Law MDOR's alleged tax assessments against Plaintiff, including MDOR's proposed upward adjustments of Plaintiff's state tax liability.

9.    Between July 27, 2009, and February 3, 2010, Plaintiff provided Defendant MDOR with additional documents and information relevant to the determination of Plaintiff's Montana state income tax liability and Purported Deficiency for the Audit Period.

10.    On March 3, 2010, Defendant MDOR notified Plaintiff that, after considering the additional documents and information provided, it had revised the additional tax, penalties, and interest with respect to Plaintiff's Montana state income tax for the Audit Period to total $57,017,038.00.

11.    On, or about, March 17, 2010, Plaintiff timely disputed the Purported Deficiency before MDOR's Office of Dispute Resolution.

12.    On, or about, January 7, 2011, Defendant MDOR notified Plaintiff that the current amount of the additional tax, penalties, and interest had grown by more than $2M in less than a year and totaled $59,424,837.00 (the "**Purported Deficiency**").

13.    After informal negotiations between Plaintiff and Defendant MDOR proved unsuccessful, on January 14, 2011, the Parties entered a stipulation wherein Defendant MDOR agreed that the proceeding before the Office of Dispute Resolution would be terminated and that Plaintiff would initiate an appeal with the State Tax Appeals Board ("**STAB**") on or before 30 calendar days following receipt of the executed stipulation.

14.     Pursuant to the stipulation, Plaintiff timely filed his complaint with STAB on February 10, 2011, (the "**STAB Complaint**") to dispute and appeal Defendant MDOR's position on each alleged tax liability, except for issue 4 (as outlined below).

15.     From their inception, Defendant MDOR's claims against Plaintiff were clearly subject to a *bona fide* dispute as to both liability and amount within the meaning of 11 U.S.C. § 303(b)(1).

16.     The STAB Complaint responded to eight counts from Defendant MDOR, specifically (the "**Audit Issue(s)**"):

| <u>**No.**</u> | <u>**Audit Issue; Tax Year**</u> | <u>**Summary**</u> |
|---|---|---|
| 1 | Yellowstone Club Loans; 2005, 2006 | Defendant MDOR's position was certain loans from the Yellowstone Entities to Blixseth Group, Inc., and subsequent loans from Blixseth Group, Inc. to Plaintiff and Edra Blixseth, were not bona fide loans, and therefore resulted in taxable income to Plaintiff under Montana law.<br><br>The Yellowstone Club Loans made during 2005 and 2006 were examined as part of an extensive Internal Revenue Service ("**IRS**") audit of BGI's 2005 and 2006 tax years. The audit determined that these loans were bona fide debt obligations of BGI and Plaintiff, respectively. Copies of the IRS audit determination letters, together with the documentation provided to the IRS concerning the loans, were provided to Defendant MDOR on, or about, December 30, 2009. MDOR was bound by the IRS's determination that the loans were bona fide debt obligations. |
| 2 | Deductions; 2005 | Defendant MDOR's position was that certain deductions claimed on Plaintiff's Montana state income tax return should be disallowed as improper deductions. |
| 3 | Unreported Pass-Through Income; 2004 | Defendant MDOR's position was that it found unreported pass-through entity income with respect to Plaintiff's income tax return. |

4

| 4 | Environmental Penalty; 2004 | Plaintiff did not dispute that Yellowstone Development, LLC erroneously deducted a $1,800,000 civil penalty on its partnership return ("**Audit Issue 4**"). The value of Audit Issue 4 was a mere $219,258 compared to the Purported Deficiency of $59,424,837. |
| | | Plaintiff did, however, dispute Defendant MDOR's ability to assess income tax liability against Plaintiff under Montana law prior to resolution of each and every Audit Issue asserted by Plaintiff because the appropriate apportionment amounts could not be determined. Nevertheless, Defendant MDOR used this minor issue as a bad-faith pretense to assert liability for all $56,869,979.00 against Plaintiff, without providing due process and despite Plaintiff disputing the overwhelming portion of liability. |
| 5 | Ordinary and Necessary Business Expenses; 2005, 2006 | Defendant MDOR's position was that certain ordinary and necessary business expenses incurred by the Yellowstone Club and the Blixseth Group, Inc. were nondeductible personal expenses of Plaintiff. |
| 6 | Apportionment; 2002 – 2006 | Pursuant to all Audit Issues, Defendant MDOR provided a recalculation of the Blixseth Group, Inc.'s Montana apportioned income based on adjustments resulting from the disputed, erroneous findings of Defendant MDOR with respect to the other Audit Issues. |
| 7 | Aviation, Marine and Automobile Business Expenses; 2005, 2006 | Defendant MDOR's position was that certain ordinary and necessary business expenses incurred by the Yellowstone Club, the Blixseth Group, Inc., Yellowstone Aviation, LLC and Western Aviation and Marine, LLC with respect to aircraft, marine vessels and automobiles were nondeductible, personal expenses of Plaintiff. |
| 8 | Allocation of Blixseth Group, Inc. Income; 2002 – 2006 | Defendant MDOR's position was certain items of pass-through income from the Blixseth Group, Inc. should be allocated solely to Plaintiff, rather than split between Plaintiff and Edra Blixseth, his spouse during the Audit Period. |

17.    In addition to full responses to each Audit Issue, Plaintiff asserted numerous meritorious defenses such as (i) Defendant MDOR's decision to assess additional tax on alleged income from passthrough entities without examining the entity or the records required for a full and fair assessment of the tax; or (2) MDOR's initial notice of the Purported Deficiency was issued on July 27, 2009, more than five (5) years after Plaintiff's personal income tax return for 2002 was filed.

18.    On March 14, 2011, while simultaneously planning the Involuntary Petition, MDOR filed a Motion to Strike the Affirmative Defenses set forth in the STAB Complaint; attached thereto was a draft of its Answer to the STAB Complaint.

19.    Until the day of the filing of the Involuntary Petition, Defendant MDOR made Plaintiff believe it would be litigating these timely-appealed audit issues in good faith before the STAB as Plaintiff and Defendant had previously stipulated; MDOR, however, had no such intention.

20.    Indeed, on March 29, 2011 – a mere 6 days before the filing – Plaintiff filed an opposition to MDOR's motion to strike Plaintiff's affirmative defenses.

21.    At the time Defendant MDOR commenced the Involuntary Proceeding, the tax dispute between the Parties was before the STAB.

22.    Nowhere in Parties' stipulation to proceed before the STAB did the Parties reach a resolution regarding the Plaintiff's tax liability.

23.    At best, the Parties simply made an agreement to bring the tax dispute to the STAB as their agreed-upon forum for resolving *their disputes*; and yet, the Defendant violated the Parties agreement by filing this case, further evidencing its bad faith.

24.    Despite the Plaintiff promptly and properly initiating a proceeding before the STAB in February of 2011 contesting Defendant MDOR's allegations and subjecting those claims to a *bona fide* dispute, on April 5, 2011 (2 months after the STAB Complaint was filed), Defendant MDOR commenced the Involuntary Proceeding, asserting in error Plaintiff owed a sum certain that was neither contingent nor subject to a *bona fide* dispute as to liability *or amount*.

25.    On information and belief, Defendant MDOR planned to commence the Involuntary Proceeding against Plaintiff as early as January 2009 and intended, while negotiating the Parties' stipulation to take their disputes before the STAB for resolution, to short-circuit the Parties' agreed-upon resolution process by filing the Involuntary Petition.

26.    Prior to January 4, 2011, MDOR was still not a creditor of the Plaintiff, and the evidence will demonstrate the State admitted the same was true on April 5, 2011.

27.    Upon information and belief, Defendant MDOR never intended to allow the STAB proceeding to run its course under Montana law and as the Parties had previously stipulated and agreed before commencing the Involuntary Proceeding against Plaintiff in bad faith.

28.    The entire basis of the Defendant MDOR's Involuntary Proceeding against the Plaintiff was Audit Issue 4, the improperly deducted civil penalty that Plaintiff decided *in good faith* not to dispute.

29.    Nevertheless, MDOR filed the Involuntary Petition based on a mere fraction of the overall Purported Deficiency thereby undermining Plaintiff's ability to fund the litigation before the STAB.

**B.    MDOR *ET AL.* COMMENCE THE INVOLUNTARY PROCEEDING.**

30.    The Involuntary Petition was filed on April 5, 2011.

**i.    Idaho State Tax Commission**

31.    The Idaho State Tax Commission ("**Idaho**") asserted a claim against the Plaintiff arising out of his alleged tax liability under Idaho law.

32.    At all relevant times, the Plaintiff disputed the amount of the tax liability asserted by Idaho.

33.    Thirteen days after the Involuntary Petition, the Plaintiff and Idaho entered into a settlement whereby Idaho asserted a tax claim of $1,124,772, but agreed to accept $925,000 in complete settlement of all income taxes, penalties, and interest for the 2005, 2007, and 2008 tax years.

34.     As a result, Idaho withdrew its participation in the Involuntary Proceeding as a petitioning creditor *nunc pro tunc* to the Petition Date.

### ii.    California Franchise Tax Board

35.     The California Franchise Tax Board ("**California**") asserted a claim against the Plaintiff arising out of his alleged tax liability to California under California law.

36.     At all relevant times, the Plaintiff disputed the amount of the tax liability asserted by California.

37.     Thirteen days after the Involuntary Petition, the Plaintiff and California entered into a settlement agreement whereby California and the Plaintiff expressly acknowledged the existence of a *bona fide* dispute regarding the Plaintiff's tax liability.

38.     Two days after executing the settlement agreement—and upon receiving payment from the Plaintiff—California withdrew its participation from the Involuntary Proceeding as a petitioning creditor *nunc pro tunc* to the Petition Date.

### iii.   MDOR Continues the Involuntary Petition in Bad Faith.

39.     Rather than attempt to settle any undisputed portion of Defendant MDOR's claims (as both Idaho and California settled their claims), Defendant MDOR pressed ahead with the Involuntary Proceeding in bad faith, with certain knowledge that Defendant MDOR's claims against Plaintiff were subject to a *bona fide* dispute under 11 U.S.C. § 303(b)(1) as to both liability and *amount*.

40.     With respect to the Involuntary Petition, the Bankruptcy Court, the United States District Court for the District of Nevada, and the Ninth Circuit Court of Appeals, all found that Idaho and California held claims against the Plaintiff that were subject to a *bona fide* dispute as a matter of law within the meaning of 11 U.S.C. § 303(b)(1).

41.     As a result, the Involuntary Proceeding never met the statutory requirements of section 303(b) of the Bankruptcy Code from its inception.[1]

---

[1]     Pursuant to 11 U.S.C. § 303(b)(1), to bring an involuntary case, three or more creditors holding at least $16,750 in aggregated, noncontingent claims, that not subject to a bona fide dispute, must prosecute the petition.

42. Defendant MDOR received constitutionally sufficient notice of the Bankruptcy Court's approval of Plaintiff's settlements with both California and Idaho, satisfying due process concerns, thereby giving rise to Defendant MDOR being bound by those rulings *in personam* from their inception.

43. Notwithstanding the fact that within a mere twenty (20) days of the Petition Date, two of the three creditors (Idaho and California) required to commence and maintain the Involuntary Proceeding acknowledged their claims were subject to a *bona fide* dispute under 11 U.S.C. § 303(b)(1) and withdrew their participation, Defendant MDOR's bad faith efforts to keep Plaintiff in bankruptcy persisted unabated for over a decade to Plaintiff's substantial detriment and damage.

## C. THE PROCEDURAL HISTORY LEADING TO THE DAMAGES PHASE OF THE CASE.

44. On April 8, 2011, the Court issued the *Order to Show Cause Why Venue in This District is Proper and Why Transfer of Case is Not Appropriate* (the "**OSC**"), *sua sponte*, setting a hearing on the OSC for April 22, 2011 (the "**OSC Hearing**")—later continued to May 18, 2011. ECF Nos. 7; 49.

45. On April 20, 2011, Idaho withdrew from the Involuntary Petition. ECF No. 20. On the same date, California withdrew from the Involuntary Petition. ECF No. 26.

46. On April 20, 2011, the Plaintiff also filed the *Motion to Dismiss Case and Response to Order to Show Cause and Counter-Motion to Dismiss*. ECF No. 23.

47. As scheduled, the Bankruptcy Court convened the OSC Hearing, concluding with a continuance to May 18, 2011. ECF No. 49.

48. On April 27, 2011, the Plaintiff filed the: (1) *Renewed Motion to Dismiss Case and Response to Order to Show Cause and Counter-Motion to Dismiss;* as well as the (2) *Motion for Sanctions Pursuant to Fed. R. Bankr. P. 9011(c) and 11 U.S.C. § 105(a)* (the "**First 9011 Motion**"). ECF Nos. 54; 55. Both motions were set for hearing with the OSC. *See* ECF No 122.

49.     On May 27, 2011, the Court entered the *Order Dismissing Involuntary Petition Against Alleged Debtor Timothy L. Blixseth* (the "**Dismissal Order**"). *Id*. The Dismissal Order provided the Plaintiff's *Renewed Motion to Dismiss*[] was rendered moot by the Court's dismissal of the Involuntary Petition; however, the Court would retain jurisdiction to hear: (1) the issues presented in the First 9011 Motion; and (2) the Plaintiff's request for statutory damages under section 303(i) of the Bankruptcy Code. *Id*.

50.     Also on May 27, 2011, the Court entered the *Scheduling Order and Continued Hearing Date*, providing notice of an evidentiary hearing—and accompanying briefing schedule—on the First 9011 Motion, as well as the Plaintiff's request for section 303(i) damages for September 1, 2011. ECF Nos. 123; *see* 124; 125. Accordingly, on June 1, 2011, the Plaintiff filed the: (1) *Application for Judgment and for Costs, Fees and Punitive Damages Pursuant to 11 USC § 303(i)* (the "**303 Sanctions Motion**"); and (2) the *Motion for Sanctions Pursuant to Federal Rules of Bankruptcy Procedure 9011 and 11 U.S.C. § 105* (the "**Renewed First 9011 Motion**"). ECF No. 139; 140.

51.      On June 10, 2011, the Defendant filed a *Notice of Appeal* of the *Order Dismissing*[]. ECF No. 146.

52.     On June 14, 2011, the Defendant filed the *Motion to Stay Pending Appeal*, set for hearing on shortened time on June 24, 2011. ECF Nos. 152; *see* 154 (*Ex Parte Motion for Order Shortening Time*); 162 (*Order Shortening Time For And Notice Of Hearing*[]).

53.     On June 23, 2011, the Plaintiff filed the *Opposition to Montana Department of Revenue's Motion for Stay Pending Appeal*. ECF No. 171. On June 30, 2011—after convening a hearing on the Defendant's request for stay pending appeal—the Court issued the *Order Denying Motion for Stay Pending Appeal*. ECF No. 186. MDOR then brought a subsequent motion seeking a stay pending appeal to the Ninth Circuit Bankruptcy Appellate Panel (the "**BAP**"), which the BAP granted on July 19, 2011. ECF No. 236.

54.     On December 17, 2012, the Court entered the BAP's *Opinion Re: [] Appeal Reference #11-19, BAP #NV-11-1305*, on the record in the Bankruptcy Case reversing the Dismissal Order. ECF No. 250.

55.     On January 18, 2013, the Plaintiff filed the *Renewed Motion to Dismiss Case* (the "**Renewed Motion to Dismiss**"). ECF No. 261.

56.     On January 30, 2013, this Court entered the *Order to Show Cause Why the Hearing on Alleged Debtor's Renewed Motion to Dismiss Bankruptcy Should Not be Vacated Due to Pending Appeal,* which this Court vacated, on February 1, 2013, following the Plaintiff's withdrawal of its appeal. ECF Nos. 274; 283.[2]

57.     On March 28, 2013, the Court entered the *Document* [sic] *Amended Joint Discovery Plan Regarding Renewed Motion to Dismiss*, setting an evidentiary hearing (the "**Evidentiary Hearing**") on the Plaintiff's Renewed Motion to Dismiss for June 13–14, 2013.[3] ECF No. 306; *see* ECF No. 472.

58.     On April 2, 2013, the Plaintiff filed the *Amended Motion to Dismiss Case and Memorandum of Points and Authorities in Support Thereof* (the "**Amended Renewed Motion to Dismiss**"). ECF No. 309. On May 29, 2013, the Defendant filed the *Opposition of Petitioning Creditor Montana Department of Revenue to Mr. Blixseth's Amended Motion to Dismiss*. ECF Nos. 437; 438 (notice of errata). On June 5, 2013, the Plaintiff filed the *Reply to Petitioning Creditor Montana Department of Revenue's Opposition to Amended Motion to Dismiss*. ECF No. 470.

---

[2]     The Plaintiff promptly filed an appeal of the BAP's decision to the Ninth Circuit Court of Appeals (the "**Ninth Circuit**"). Plaintiff subsequently withdrew his appeal as a result of the Court's January 30, 2013, *Order to Show Cause*[] allowing the Plaintiff to seek relief on the Renewed Motion to Dismiss. ECF Nos. 276; 282; 283.

[3]     The Court limited the June 2013 evidentiary hearing to dismissal of the Involuntary Petition under section 303(b)—reserving the issue of the Section 303 Sanctions Motion and the Amended Renewed First 9011 Motion.

59.     On June 13–14, 2013, the Court convened the Evidentiary Hearing. ECF No. 528. On July 10, 2013, the Court entered the *Order Granting Motion to Dismiss Involuntary Case*. ECF No. 528.

60.     On July 22, 2013, the Defendant filed the *Notice of Appeal*. ECF No. 541. On July 23, 2013, the Plaintiff filed the *Notice Timothy L. Blixseth's Separate Statement of Election to Have Appeal Heard by the United States District Court for the District of Nevada Instead of the Bankruptcy Appellate Panel Pursuant to 28 U.S.C. § 158(c)(1)(B)*. ECF No. 549.

61.     On August 5, 2013, the Plaintiff filed the *Cross Appeal* accompanied by the *Election to Appeal to District Court, With Certificate of Service Timothy L. Blixseth's Separate Statement of Election to Have Cross-Appeal Heard by the United States District Court for the District of Nevada Instead of the Bankruptcy Appellate Panel*. ECF Nos. 566; 569.

62.     On August 9, 2013, Defendant MDOR filed the *Motion to Stay Pending Appeal*. ECF No. 583. On the same day, the Plaintiff filed the *Opposition to Petitioning Creditor Montana Department of Revenue's Motion for Stay Pending Appeal*. ECF No. 592. On August 30, 2013, the Plaintiff filed the *Supplemental Opposition to Petitioning Creditor Montana Department of Revenue's Motion for Stay Pending Appeal*. ECF No. 612. On September 6, 2013, the Court entered the *Order Granting a Stay of Proceeding Pending Appeal*. ECF No. 635.

63.     On October 2, 2013, the Plaintiff filed the *Motion to Reconsider Timothy L. Blixseth's Motion Pursuant to Fed. R. Bankr. P. 9023 and Fed. R. Civ. P. 59(e) to Amend the Order Granting a Stay of Proceedings Pending Appeal*. ECF No. 638. On October 2, 2013, the Defendant filed the *Opposition to Mr. Blixseth's Ex Parte Application for an Order Shortening Time*. ECF No. 642. On October 30, 2013, the Plaintiff filed the *Reply Montana Department of Revenue's Opposition to Motion to Amend the Order Granting a Stay of Proceedings Pending Appeal*. ECF No. 651. On November 12, 2013, the Court entered the *Order Denying Mr. Blixseth's Motion Pursuant To Fed.R.Bankr.P. 9023 And Fed.R.Civ.P. 59(c) to Amend Order Granting A Stay of Proceedings Pending Appeal*. ECF No. 653.

64.    On December 15, 2017, the District Court entered the *Final Order Re: Appeal. Appeal Reference # 13-27; 13-29 U.S. District Court # 13-cv-01324 Ninth Circuit # 13-80215; 13-16582*, affirming the Dismissal Order. ECF No. 734. The Defendant Appealed to the Ninth Circuit. *See* ECF No. 743. On January 15, 2020, the Court entered the *9th Circuit Opinion; and Mandate Re: Appeal. Appeal Reference # 13-27 U.S. District Court # 13-cv-01324-JAD Ninth Circuit # 18-15064*, upholding the Dismissal Order. *Id.*

65.    On October 9, 2020, Defendant MDOR filed the *Montana Department of Revenue's Motion for Relief from Judgment* and its accompanying *Montana Department of Revenue's Memorandum in Support of Its Motion for Relief From Judgment* seeking reconsideration of the Dismissal Order. ECF Nos. 770; 771.

66.    On October 14, 2020, the Plaintiff filed the *Motion to Strike Montana Department of Revenue's Motion for Relief from Judgment and Memorandum in Support Thereof.* ECF No. 774. On October 30, 2020, Defendant MDOR filed the *Opposition to Motion to Strike*. ECF No. 784. On October 30, 2020, the Plaintiff filed the *Opposition to Montana Department of Revenue's Motion for Relief from Judgment and Memorandum in Support thereof*. ECF No. 785. On November 6, 2020, the Defendant filed the *Reply Memorandum in Support of Montana Department of Revenue's Motion for Relief From Judgment.* ECF No. 786.

67.    On June 3, 2021, the Court entered the *Order On Montana Department Of Revenue's Motion For Relief From Judgment,* denying relief and further denying the *Motion to Strike*. ECF No. 827.

68.    On October 9, 2020, the Plaintiff filed the *Motion Confirming Dismissal of Involuntary Petition, or, in the Alternative, Motion to Dismiss Involuntary Petition for Want of Prosecution Pursuant to 11 U.S.C. § 303(j)*. ECF No. 772.

69.    On October 30, 2020, Defendant MDOR filed the *Opposition [Memorandum in Opposition to Motion to Confirm Dismissal]*. ECF No. 784. On November 6, 2020, the Plaintiff filed the *Omnibus Reply to the Montana Department of Revenue's Memorandum In Opposition to (1) Motion to Confirm Dismissal and (2) Motion to Strike*. ECF No. 787.

70.     On June 3, 2021, the Court entered the *Order on Motion Confirming Dismissal Of Involuntary Petition, Or, In The Alternative, Motion To Dismiss Involuntary Petition For Want Of Prosecution Pursuant To 11 U.S.C. Section 303(j)* (the "**2021 Dismissal Order**"). ECF No. 828.

71.     The 2021 Dismissal Order was not appealed and is now a final order.

**D.      THE DETRIMENTAL IMPACT OF MDOR'S BAD FAITH AND DECADE-LONG LITIGATION CRUSADE AGAINST PLAINTIFF.**

72.     Defendant MDOR's bad faith decision to both (i) commence the Involuntary Proceeding and (ii) continue its prosecution notwithstanding California's and Idaho's settlements and withdrawals irreparably harmed Plaintiff, personally, professionally, physically, emotionally, and financially in numerous facets of his life.

73.     For instance, because the financial hardship(s) visited upon Plaintiff by Defendant MDOR's bad faith commencement and continued prosecution of the Involuntary Proceeding, Plaintiff was subjected to a civil contempt order by the United States District Court for the District of Montana, pursuant to which Plaintiff was wrongfully incarcerated for a period of approximately 14 months.

74.     Due to the extraordinary and prolonged period of immense stress visited upon Plaintiff as a direct result of Defendant MDOR's bad faith commencement and continued and prolonged prosecution of the Involuntary Proceeding in bad faith within the meaning of 11 U.S.C. § 303(i), Plaintiff was diagnosed with cancer, irrevocably altering the course of his life.

75.     Plaintiff participated in many philanthropic efforts to aid and enhance the communities in which he did business and lived, including high-profile participation in humanitarian projects like Habitat-for-Humanity, working alongside former President of the United States Jimmy Carter.

76.     Plaintiff would frequently come to the aid of people he never met and communities far from his home.  Most notably, Plaintiff wrote the "Heart of America," a song inspired by the devastation visited upon the Gulf States by Hurricane Katrina.  The song served as a call to action

14

for people all over the United States to pitch in and help rebuild the Gulf, and featured singers Michael McDonald, Wynona Judd, and Eric Benet.  The song helped raise over $127 million for the victims of Hurricane Katrina and their rebuilding efforts.

77.    All of that philanthropy is now gone, thanks directly to the bad faith and scorched earth litigation tactics of Defendant MDOR.

78.    Defendant MDOR's decade-long, bad faith war of attrition rendered Plaintiff a stranger in communities and in circles in which he was formerly a familiar and welcome face.

79.    Accompanying Plaintiff's personal detachment from former business colleagues and community partners is his alienation from charitable causes, which the evidence at trial will demonstrate informed and enriched much of Plaintiff's life.

80.    The financial black cloud that Defendant MDOR caused to hang over Plaintiff's head for a decade continues to cast a shadow on every act Plaintiff undertakes, every word he utters, every business transaction he tries to undertake, and stripped him of the ability to act charitably.

81.    Defendant MDOR's decade-long, bad faith war of attrition against Plaintiff in the Involuntary Proceeding irreparably damaged both Plaintiff's personal and professional reputations.

82.    Defendant MDOR's bad faith decisions to both commence and continue the prosecution of the Involuntary Proceeding against Plaintiff were the cause in fact, and proximate cause of substantial monetary damages to Plaintiff in an amount to be proven at trial and, at a minimum, totaling hundreds of millions of dollars.

83.    The Involuntary Proceeding should have ended in 2011.  It continued needlessly and in bad faith until the year 2021, at catastrophic personal and financial expense to Plaintiff.

84.    That Plaintiff prevailed in defeating Defendant MDOR's doomed and bad faith efforts to keep Plaintiff in a state of financial and economic ruin in perpetuity; however, that victory is, at best, a hollow victory given the substantial financial damages visited upon Plaintiff

by Defendant's bad faith and scorched-earth litigation tactics, as well as the irreparable physical, emotionally, and personal tolls Plaintiff suffered for over a decade.

85.     Absent an award of substantial money damages aimed, however imperfectly, at making Plaintiff whole under the law, and answering Defendant MDOR's malicious conduct in kind with an award of punitive damages, Plaintiff's victory in defeating the specious and bad faith Involuntary Proceeding will be just that: only a legal victory.

86.     Plaintiff's personal and emotional wellbeing, psychological and spiritual losses, his loss of community and charitable involvement, his frayed and shattered businesses and personal friendships, cannot be recovered or mended through the entry of an order confirming what Plaintiff has always believed and knew all along: that he was right, and that Defendant MDOR was wrong.

87.     Plaintiff respectfully submits that the law should not treat people in this manner, especially at the hand of state actors and government officials.  If anything, public officials must be held to a higher standard under 11 U.S.C. § 303(i) - precisely because they can cause the entire machinery of a local, state, or federal government entity to be brought to bear, as was the case here, against a single person.  And, as will be the case in the overwhelming majority of such instances, individuals will either lack the means and/or the will to fight back effectively.  So, the bad faith commencement of the Involuntary Proceeding against Plaintiff is both an apt and timely vehicle for sending the message loudly and clearly: the Bankruptcy Court will not allow the law to be misused to mistreat people as Defendant MDOR's bad faith, scorched earth, and punitive litigation tactics have mistreated and damaged Plaintiff.

88.     Upon information and belief, Plaintiff alleges that the state actors who authorized Defendant MDOR to commence the Involuntary Proceeding against him include the former governor and attorney general of the State of Montana, among others.

89.     Upon information and belief, these same state actors have, in violation of public record keeping laws of the State of Montana and Federal law, failed to preserve and/or destroyed electronic mail and other correspondence that would establish Defendant MDOR's bad faith, as

well as, perhaps, substantiate Plaintiff's claim that Defendant MDOR's bad faith litigation conduct in this case was part of a broader conspiracy to ruin Plaintiff, both personally and financially.

90.    Defendant MDOR and its counsel further engaged in numerous instances of bad faith conduct throughout this decade-long Involuntary Proceeding, including knowingly misleading this Court with respect to counsels' representation of both MDOR and Idaho.

91.    Defendant MDOR and its counsel relied on overturned and outdated law, and misrepresented the issues before this Court in an effort to evade the ruling of the Ninth Circuit Court of Appeals, including telling this Court it could represent the interests of Idaho and California in continuing to prosecute the Involuntary Petition.

92.    Returning to the facts of the Involuntary Proceeding, the Bankruptcy Court has found, and been repeatedly affirmed, that Defendant MDOR's claims were the subject of a dispute before the STAB, thereby rendering Defendant MDOR ineligible under section 303(b) to serve as a petitioning creditor from the outset.  MDOR knew this was the case, but proceeded anyway.

93.    Indeed, it is axiomatic that a creditor willing to stipulate with a debtor to resolve its claim in the STAB holds a claim subject to a *bona fide* dispute.

94.    Defendant MDOR and its counsel falsely alleged that Defendant MDOR is an eligible petitioning creditor by signing and filing the Involuntary Petition while knowing its claims were subject to *bona fide* dispute as to both liability and amount.

95.    By throwing Plaintiff into the Involuntary Proceeding for a decade, Defendant MDOR made it virtually impossible for Plaintiff to defend himself before the STAB.

96.    Upon information and belief, the Defendant and its attorneys did virtually no investigation into whether the Plaintiff was paying his debts as they came due.

### E.    MR. BLIXSETH'S ASSETS AT THE TIME THE INVOLUNTARY PETITION WAS FILED.

97.    As of the date the Involuntary Petition was filed, Mr. Blixseth owned several valuable assets, all of which he was forced to sell at significant losses to defend himself and his

entities from the myriad of defaults, legal claims, and costs arising from or related to the Involuntary Petition.

98.     Prior to the filing of this case, Mr. Blixseth was a successful businessman, premier real estate developer, and entrepreneur, who expected to entitle, develop, and use his assets as he had always done prior to the filing of the Involuntary Petition.

99.     Mr. Blixseth's assets, all lost due to and/or arising from the Involuntary Petition included the following:

### i.     **Tamarindo Resort.**

100.     Mr. Blixseth owned the Tamarindo Resort, through various entities, which was a resort property in Manzanillo, Mexico, often referred to as "Tamarindo." The Plaintiff purchased Tamarindo on or about April 25, 2006, for approximately $40,000,000. Due to the filing of this case, Mr. Blixseth was forced to sell the property in 2011, for $13,820,139.84, and a net loss of $26,179,860.16, and damages of no less than $27,349,000.

101.     The property included a 30-unit boutique hotel, 12,000 square feet of corporate offices, 4 finished homes, 900 feet of ocean frontage, a bar, a restaurant, and is adjacent to a golf course. Mr. Blixseth expected to develop Tamarindo; however, those expectations were crushed by MDOR's bad faith prosecution of the Involuntary Petition. The development of Tamarindo included plans for the construction of luxury beachfront and hillside homes. The development value of Tamarindo was no less than $81,000,000.

### ii.     **Turks and Caicos.**

102.     Mr. Blixseth owned, through various entities, property in Turks and Caicos, which included a 30,000 square foot private residence on a private island. The asset was purchased in 2006 for $28,000,000. Mr. Blixseth intended to develop the property as an exclusive destination resort and vacation getaway; however, due to the Involuntary Petition, he was forced to sell the property in October 2012, for $19,500,000, causing a loss of $8,500,000, before costs. The costs of the sale were $15,382,306.40, leaving a net recovery to the Plaintiff of $4,117,693.60. Mr. Blixseth submits the value of the private island and the residence on it was no less than

$35,000,000 at the time of the Involuntary Petition, and that he incurred damages of no less than $31,674,000.

### iii.  **Western Pacific Timber.**

103.  Prior to the filing of this case, through various entities, Mr. Blixseth owned one-third of the membership interests in Western Pacific Timber, LLC ("**WPT**").  During his ownership of WPT, the Plaintiff received an annual management fee of $500,000, paid in equal monthly installments. Mr. Blixseth lost his ownership in WPT through a series of transactions with one of the company's members, who called the Plaintiff in default under the parties' contracts due to the MDOR's filing of the Involuntary Petition.  As a result of the defaults arising from the filing of this case, Mr. Blixseth's ownership in WPT was foreclosed.  Mr. Blixseth's lost income from his annual WPT management fee was no less than $9,462,000.  The damages from the loss of Mr. Blixseth's equity in WPT, which was caused directly by this case, was no less than $72,418,000.

104.  WPT also owned approximately 146,000 acres of timberland.  As part of WPT's operations, it harvested and sold timber, and periodically sold land.  Based on his experience, the Plaintiff estimates WPT's land could be sold and/or developed for future profits of $100,000,000 per member, however, again, Mr. Blixseth's interests in these assets were taken from him as a result of the Involuntary Petition.

### iv.  **Desert Ranch.**

105.  Desert Ranch, LLLP ("**Desert Ranch**") held Mr. Blixseth's assets after his divorce from Edra Blixseth.  Desert Ranch owned and controlled several entities and Mr. Blixseth owned 98% of Desert Ranch.  Included in Desert Ranch's assets were approximately 3,000 acres of developable land, which Mr. Blixseth was forced to sell due to the filing of this case.

106.  The Plaintiff submits that if Desert Ranch simply held the 3,000 acres it owned at the time of the filing of this case, his damages from the loss of the land is no less than $50,633,000.

107.  The Plaintiff submits the loss of the opportunity to develop the property cost Mr. Blixseth no less than $169,100,000.

108. As part of its holdings, Desert Ranch owned a tree nursery, which included approximately 30,000 trees. The value of the tree nursery at the time of the dismissal of the Involuntary Petition was no less than $4,500,000. The tree farm was income producing, and the Plaintiff submits the forced sale of Desert Ranch's land, including the Tree Nursery, deprived him of continuing income, cash flow and personal net worth.

**v.    Western Air & Water, LLC.**

109. Through various entities, Mr. Blixseth owned Western Air & Water, LLC ("**WAW**"). WAW owned 2 boats and a plane. Due to the Involuntary Petition, WAW was forced to sell its N650 GC Aircraft on February 28, 2014, for a $1,000,000 loss.

110. On September 15, 2014, WAS sold a 156-foot yacht named Piano Bar at a loss of $1,850,000.

111. On December 19, 2013, WAS sold a 58 Foot Fishing Boat named Piano Bar Too at a loss of $475,000.

112. The value of these assets, however, as of the date of the filing of this case, was no less than $5,750,000.

**vi.    Legal Fees.**

113. Mr. Blixseth incurred a total of $6,915,511.00 of legal fees, costs and interest paid due to the filing of the Involuntary Petition. The Plaintiff is liable for an additional $3,181,696.47 of unpaid invoices for legal fees and costs related to this matter. Further, Mr. Blixseth incurred approximately $1,150,000 of legal fees and costs from Schwartz Law, PLLC, which fees and costs are accruing as this action is ongoing.

**vii.    Other Assets.**

114. The Plaintiff also owned other assets, including land in Wyoming referred as Monster Lake Ranch, as well as land in Montana, all of which he was forced to sell to fund the cost of the litigation related to and arising from this case, as well the carry costs of the balance of his assets and his life. Mr. Blixseth's damages in this regard, both personal and professional, will be proven at trial in amounts no less than $6,745,000.

**F.      THE PLAINTIFF SOLD HIS ASSETS TO FUND THE LITIGATION ARISING FROM AND DUE TO THE INVOLUNTARY PETITION AND TO CARRY THE COSTS OF HIS ASSETS AND LIFESTYLE.**

115.    Mr. Blixseth first had to sell the Tamarindo Resort in 2011 to fund the cost of the litigation related to and arising from this case, as well the carry costs of the balance of his assets and his life.  Uncertain of the arc this case would take, and stymied by the cloud of the automatic stay, Mr. Blixseth next sold the Turks and Caicos residence in 2012 – again to fund the cost of the litigation related to and arising from this case, as well the carry costs of the balance of his assets and his life.  As set forth above, as a result of the Involuntary Petition, Mr. Blixseth was forced out of WPT, which included the loss of his annual management fee, which in addition to this case, contributed to the forced sale WAW's assets in 2013 and 2014 to fund the cost of the litigation related to and arising from this case, as well the carry costs of the balance of his assets and his lifestyle.  Finally, Mr. Blixseth was forced to sell the Desert Ranch assets in 2013 to fund the cost of the litigation related to and arising from this case, his lifestyle and the Defendant's relentless pursuit of Mr. Blixseth in this forum and others.

**IV.    CLAIMS FOR RELIEF.**

**COUNT I**

**JUDGMENT AGAINST DEFENDANT MDOR FOR REASONABLE COSTS AND ATTORNEY'S FEES PURSUANT TO 11 U.S.C. § 303(i)(1)(A)–(B)**

116.    The foregoing allegations of this Complaint are incorporated into this paragraph by this reference in their entirety.

117.    The plain language of the statute provides that upon dismissal of the Involuntary Proceeding, Defendant MDOR is now liable for the attorney's fees and cost associated with Plaintiff securing the dismissal.

118.    As such, the Defendant is liable for the attorney's fees and costs incurred by the Plaintiff in connection with, arising from and relating to this bad faith and punitive Involuntary Proceeding commenced and prosecuted by MDOR.

**COUNT II**

**JUDGMENT AGAINST DEFENDANT MDOR THAT IT COMMENCED THE INVOLUNTARY PROCEEDING IN BAD FAITH, DAMAGES PROXIMATELY CAUSED BY DEFENDANT MDOR'S BAD FAITH BANKRUPTCY FILING, AND PUNITIVE DAMAGES PURSUANT TO 11 U.S.C. § 303(i)(2)(A)–(B)**

119.    The foregoing allegations of this Complaint are incorporated into this paragraph by this reference in their entirety.

120.    For over a decade, Defendant MDOR furthered its bad faith arguments before this Court, and every court sitting in review, in an effort to hold off the inevitable award of damages and sanctions under, among other sources of law, 11 U.S.C. § 303(i).

121.    Defendant MDOR has submitted in bad faith before this Court, the District Court, and the Ninth Circuit Court of Appeals that the Involuntary Proceeding met the standard of section 303(b) despite the fact that the Idaho claim was clearly subject to a *bona fide* in dispute as evidenced by the fact that Idaho and the Plaintiff settled for less than face amount of the claim.

122.    Defendant MDOR has submitted in bad faith before this Court, the District Court, and the Ninth Circuit Court of Appeals that the Involuntary Proceeding met the standard of section 303(b) despite the fact that the California claim was settled under an agreement that clearly provided the claim was subject to a *bona fide* dispute.

123.    Defendant MDOR has submitted in bad faith before this Court, the District Court, and the Ninth Circuit Court of Appeals that the Involuntary Petition met the standard of section 303(b) despite the fact that its claim was subject to a *bona fide* dispute as evidenced by the fact the Plaintiff was before the STAB contesting the claim.

124.    Defendant MDOR has submitted in bad faith before this Court, the District Court, and the Ninth Circuit Court of Appeals that the Involuntary Petition met the standard of section 303(b) despite the fact that its claim was contingent as to both liability and *amount*.

125.    Defendant MDOR argued in bad faith that this Court could set aside the ruling of the Ninth Circuit Court of Appeals under Fed. R. Civ. P. 60.

126.    The Plaintiff submits the MDOR is both the cause in fact and the proximate cause of his personal, professional, physical, emotional, and financial damages, all in amounts to be proven at trial.

**COUNT III**

**JUDGMENT AGAINST COUNSEL FOR PETITIONER FOR SANCTION PURSUANT TO FED. R. BANKR. P. 9011(b)–(c)**

127.    The foregoing allegations of this Complaint are incorporated into this paragraph by this reference in their entirety.

128.    Defendant MDOR is liable for sanctions under Rule 9011 due to its misrepresentation of the current law after the 2005 amendments to the Bankruptcy Code.

129.    Defendant MDOR is liable for sanctions under Rule 9011 due to its counsel's falsification regarding the representation of Idaho and California on the record.

130.    Defendant MDOR is liable for sanctions due to its efforts to continue the Involuntary Petition on behalf of Idaho and California after the ruling the Ninth Circuit Court of Appeals.

131.    Defendant MDOR's actions warrant sanctions, including the reimbursement for Plaintiff's legal fees incurred and related to this case.

**JURY TRIAL ELECTION**

Pursuant to Fed. R. Bankr. P. 9015 and Fed. R. Civ. P. 38, Plaintiff asserts his right to jury trial on all triable issues presented herein.

**PRAYER**

WHEREFORE, the Plaintiff respectfully requests judgment from the Court as follows:

a.    An award of reasonable attorney's fees and costs in the amount to be proven at trial;

b.    An award of proximate damages in an amount to be proven at trial;

c.    An award of compensatory damages in an amount to be proven at trial;

d.    An award of punitive damages in an amount to be proven at trial;

e.       An award of sanctions in an amount to be proven at trial;

f.       Any other relief that the Court deems just and proper.

Respectfully submitted by:

SCHWARTZ LAW, PLLC


By: /s/ Samuel A. Schwartz
Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Athanasios E. Agelakopoulos, Esq.
Nevada Bar No. 14339
Emily D. Anderson, Esq.
Nevada Bar No. 13814
Telephone: (702) 385-5544
Facsimile: (702) 442-9887
*Attorneys for the Plaintiff*